IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MELVIN HOWARD,                    :    CIVIL ACTION
                                  :    No. 99-4880
          Plaintiff,              :
                                  :
     v.                           :
                                  :
MARTIN HORN, et al.,              :
                                  :
          Respondents.            :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        November 4, 2014

Table of Contents

I.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . 2
II.  PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . 4
III. LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . 6
IV.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . 7
     A.   Claim A: Ineffectiveness for Failure to Reasonably
          Investigate, Develop, and Present Exculpatory
          Background and Mental Health Evidence . . . . . . . 9
          1.   Standard for IAC Claims. . . . . . . . . . . . 10
          2.   Analysis . . . . . . . . . . . . . . . . . . . 12
               a.   Actual Innocence . . . . . . . . . . . . 13
               b.   No Prejudice . . . . . . . . . . . . . . 16
     B.   Claim B: The Prosecutor Used His Peremptory Challenges
          in a Racially Discriminatory Manner; Counsel Were
          Ineffective at Trial and on Direct Appeal . . . . . 19
          1.   Step 1: Prima Facie Showing. . . . . . . . . . 20
               a.   Statistical Evidence . . . . . . . . . . 22
               b.   Culture of Discrimination. . . . . . . . 24
          2.   Step 2: Race-Neutral Explanation . . . . . . . 26
          3.   Step 3: Proving Purposeful Discrimination. . . 29
     C.   Claim C: The Prosecutor's Closing Argument Violated
          Due Process; Trial Counsel Was Ineffective for Failing
          to Object to the Improper Argument. . . . . . . . . 31
          1.   Statements on Witness's Military Background. 33
          2.   Statement about Petitioner's Failure to Call
               Fred Brown . . . . . . . . . . . . . . . . . . 37

3.     Statement Faulting Petitioner for Failing to Produce Witnesses or Evidence. . . . . . . . 39
4.     Statement Suggesting that the Jury Base Their Verdict on Sympathy for the Victim . . . . . 40
5.     Statements About Juror's Duty to Protect Decent Neighborhoods and Provide Solution to Crime. 41
6.     Cumulative Prosecutorial Misconduct. . . . . 42
D.  Claim E: Ineffectiveness of Trial Counsel for Failure to Timely Request a Jury Instruction that the Jury Could Not Draw an Adverse Inference from Petitioner's Failure to Testify. . . . . . . . . . . . . . . . . 43
1.     Harmless Error . . . . . . . . . . . . . . . 45
2.     Performance Prong. . . . . . . . . . . . . . 47
3.     Prejudice Prong. . . . . . . . . . . . . . . 48
a.     Review of the Evidence . . . . . . . 48
b.     Petitioner is Not Entitled to Habeas Relief . . . . . . . . . . . . . . . 51
V.    CERTIFICATE OF APPEALABILITY . . . . . . . . . . . . . . . 57
VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 57

Melvin Howard ("Petitioner") is a prisoner at State Correctional Institution—Greene in Waynesburg, Pennsylvania. Petitioner filed a counseled petition seeking relief through a writ of habeas corpus under 28 U.S.C. § 2254 ("Habeas Petition"). Magistrate Judge Lynne A. Sitarski ("Judge Sitarski") recommended denial of the Habeas Petition without an evidentiary hearing and with no certificate of appealability. Petitioner's counsel raises four objections. For the following reasons, the Court will adopt Judge Sitarski's Report and Recommendation.

## I.   FACTUAL BACKGROUND

In 1989, Petitioner was convicted of first degree murder and sentenced to death. In 2011, Petitioner's death

sentence was vacated and he was resentenced to life in prison without parole. The conviction stems from an altercation between Petitioner and two other men that resulted in Petitioner stabbing one of the men to death. Report and Recommendation ("R&R") 1-2, ECF No. 84.

The Pennsylvania Supreme Court offered the following summary of the facts:

> Shortly after midnight on September 27, 1987, Petitioner was involved in an altercation with two men, one of whom was the decedent, at the intersection of 52nd and Market Streets in Philadelphia. Petitioner called out for help, and four men came to the scene and chased the decedent and the other man away. Shortly thereafter, the decedent returned with a piece of wood, which he swung at Petitioner. Petitioner then pulled out a knife. The decedent and the other man took off in different directions. Petitioner, along with three or four other men, pursued the decedent, who threw his piece of wood at Petitioner but missed. Petitioner continued to chase the decedent until the decedent fell, and as he started to get up Petitioner punched him and knocked him to the ground. Petitioner began to stab the decedent repeatedly, at one point using both hands to plunge the knife into decedent's chest. Petitioner then left the scene, fled to Georgia where his mother lived, and was eventually arrested there. The knife was not recovered.

Commonwealth v. Howard, 645 A.2d 1300, 1303 (Pa. 1994).

## II.   PROCEDURAL BACKGROUND

On September 13, 1989, a jury in the Philadelphia
Court of Common Pleas convicted Petitioner of first degree
murder and other charges relating to the killing of Clarence
Woodlock; the next day, the jury sentenced him to death. Id. at
2. After the Pennsylvania Supreme Court affirmed the judgment,
Petitioner initiated state post-conviction ("PCRA") proceedings,
which were denied without an evidentiary hearing on April 17,
1997. Mem. Supp. Habeas Pet. 6, ECF No. 58. The denial was
affirmed the following year. Id. On July 17, 1999, after new
evidence was discovered, Petitioner filed a second PCRA
petition--the denial of which was similarly affirmed by the
Pennsylvania Supreme Court on January 22, 2002. Id. at 6-7.

On September 30, 1999, while the second PCRA petition
was pending, Petitioner filed a petition for federal habeas
relief. Habeas Pet., ECF No. 1. On June 18, 2003, Petitioner
filed a motion to hold federal proceedings in suspense pending
exhaustion of a claim that, in light of the Supreme Court's
decision in Atkins v. Virginia, 536 U.S. 304 (2002), his death
sentence was unconstitutional because of his alleged mental
retardation. Mem. Supp. Habeas Pet. 7, ECF No. 58.

During state court proceedings involving his Atkins
claim, Judge Carolyn Engel Temin of the Philadelphia Court, with

the consent[1] of the parties, vacated Petitioner's death sentence and resentenced him to life without parole on September 16, 2011. Pet'r's Objections 1, ECF No. 88. Petitioner's motion to reactivate his federal habeas proceedings was granted on December 22, 2011. Id. at 2.

Petitioner filed a supplemental memorandum in support of his Habeas Petition, on April 6, 2012. Mem. Supp. Habeas Pet., ECF No. 58. In it, Petitioner raised nine claims, including an ineffective assistance of counsel ("IAC") claim for failure to investigate, develop, and present exculpatory mental health evidence, and a Batson claim against the prosecutor's racially discriminatory peremptory challenges, among other things. The Commonwealth filed a response to Petitioner's supplemental memorandum on October 10, 2012, asserting that Petitioner's claims were all meritless and/or procedurally defaulted. Resp. Mem. Supp. Habeas Pet., ECF No. 71. Petitioner then filed a reply on March 11, 2013. Pet'r's Reply Mem. Supp. Habeas Pet., ECF No. 83.

Upon referral, Judge Sitarski issued a report and recommendation on April 16, 2014, advising the denial of the Habeas Petition on the merits without an evidentiary hearing and

---

[1] Although the parties agreed to this, the Commonwealth did not concede mental retardation, nor did the court make a finding of mental retardation. R&R 9 n.7, ECF No. 84.

with no certificate of appealability. R&R 1. Petitioner filed objections on June 30, 2014. Pet'r's Objections, ECF No. 88. The matter is now ripe for disposition.

## III. LEGAL STANDARD

The Court may refer an application for a writ of habeas corpus to a U.S. Magistrate Judge for a report and recommendation. 28 U.S.C. § 636(b)(1)(B). A prisoner may object to the magistrate judge's report and recommendation within fourteen days after being served with a copy thereof. See 28 U.S.C. § 636(b)(1); E.D. Pa. R. 72.1(IV)(b). The Court must then "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The Court does not review general objections. See Brown v. Astrue, 649 F.3d 193, 195 (3d Cir. 2011) ("We have provided that § 636(b)(1) requires district courts to review such objections de novo unless the objection is not timely or not specific." (internal quotation marks omitted)). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. Therefore, the Court will conduct a de novo review of those portions of the Report and Recommendation to which Petitioner objects.

6

On habeas review, the Court must determine whether the state court's adjudication of the claims raised was (1) contrary to, or an unreasonable application of, clearly established federal law, or (2) based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d) (2006).

## IV.  DISCUSSION

Judge Sitarski recommends that Petitioner's habeas claims be denied without an evidentiary hearing, concluding that there is no probable cause to issue a certificate of appealability. Of the nine claims Judge Sitarski denied, Petitioner objects to the denial of four of them specifically: Claims A, B, C, and E.[2]

---

[2]     As set forth in Petitioner's Supplemental Memorandum of Law in Support of Petition for Writ of Habeas, the full list of the claims is as follows:

1.   Ineffectiveness for failure to reasonably investigate, develop, and present exculpatory background and mental health evidence. (Claim A)

2.   The prosecutor used his peremptory challenges in a racially discriminatory manner; counsel were ineffective at trial and on direct appeal. (Claim B)

3.   The prosecutor's closing argument violated due process; trial counsel was ineffective for failing to object to the improper argument. (Claim C)

4.   Counsel was ineffective for eliciting harmful evidence and failing to present helpful evidence. (Claim D)

In her analysis, Judge Sitarski determined that "because the Pennsylvania Supreme Court did not apply an 'adequate and independent' state law ground in dismissing Petitioner's second PCRA petition, Petitioner's claims are not procedurally defaulted." R&R 14-15, ECF No. 84. Further, since the Pennsylvania courts did not reach the merits of Petitioner's second PCRA petition, Judge Sitarski addressed Claims A, B, and C de novo. For Claim E, given that the Pennsylvania Supreme Court denied it on the merits, Judge Sitarski undertook an AEDPA merits review to determine if the resolution of Claim E resulted in a decision that was "contrary to or an unreasonable application of clearly established federal law" or was "based on

---

5.   Petitioner was denied effective assistance of counsel when counsel failed to timely request a jury instruction that the jury not draw an adverse inference from Petitioner's failure to testify. (Claim E)

6.   The trial court violated petitioner's Fifth and Fourteenth Amendment rights by permitting the Commonwealth to introduce Petitioner's statement incorporating evidence of other crimes. (Claim F)

7.   Petitioner was denied effective assistance of counsel when counsel failed to request a cautionary instruction to prevent the jury from concluding Petitioner was previously convicted of other crimes after the jury asked to see Petitioner's "mug shot." (Claim G)

8.   Petitioner is entitled to relief because of the cumulative prejudicial effects of the errors in this case. (Claim H)

R&R 9-10, ECF No. 84.

an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Id. at 52. Each claim will be considered below.

A. Claim A: Ineffectiveness for Failure to Reasonably Investigate, Develop, and Present Exculpatory Background and Mental Health Evidence

In Claim A, Petitioner asserts that his trial counsel was ineffective for failing to reasonably investigate, develop, and present exculpatory life history and mental health evidence. Mem. Supp. Habeas Pet. 12-13, ECF No. 58. Petitioner offers several expert reports showing that he suffers from a number of mental health issues, including mild mental retardation, paranoid personality disorder, and impaired cerebral functioning. Id. at Exs. 1-5. He has also provided affidavits from family members and acquaintances that describe the traumatic setting of his youth and how it may have prevented him from developing mentally and emotionally. Id. at Exs. 6-15.

Petitioner argues that his counsel was ineffective for failing to investigate and present evidence of his mental health issues, which, according to Petitioner, would have provided evidence to support his case for (1) imperfect self-defense voluntary manslaughter, (2) "provocation and passion" voluntary manslaughter, and (3) diminished capacity third-degree murder.

Id. at 7. Respondents argue that these defenses would have
conflicted with counsel's more reasonable trial strategy of
focusing on actual innocence. Resp. Mem. Supp. Habeas Pet. 28,
ECF No. 71. Moreover, Respondents assert that the evidence
offered by the Petitioner would not satisfy the elements of the
proposed defenses of imperfect self-defense, provocation and
passion, or diminished capacity. Judge Sitarski agrees, and
according to the reasoning below, the Court will deny habeas
relief on Claim A.

### 1.   Standard for IAC Claims

The Sixth Amendment right to counsel is the right to
effective assistance of counsel. See Strickland v. Washington,
466 U.S. 668, 686 (1984). To warrant reversal of a conviction, a
prisoner must show (1) that his counsel's performance was
deficient and (2) that the deficient performance prejudiced his
defense. See id. at 687; Holland v. Horn, 519 F.3d 107, 120 (3d
Cir. 2008). The principles governing IAC claims under the Sixth
Amendment apply in collateral proceedings attacking a prisoner's
sentence. See Strickland, 466 U.S. at 697-98.

To prove deficient performance, a prisoner must show
that his "counsel's representation fell below an objective
standard of reasonableness." Id. at 688. The Court will consider
whether counsel's performance was reasonable under all of the

10

circumstances. Id. Furthermore, the Court's "scrutiny of counsel's performance must be highly deferential." See id. at 689. That is, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. In raising an IAC claim, the petitioner must first identify the acts or omissions that are allegedly not the result of "reasonable professional judgment." Id. at 690. Next, the court must determine whether those acts or omissions fall outside of the "wide range of professionally competent assistance." Id.

A petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." United States v. Gray, 878 F.2d 702, 710 (3d Cir. 1989). This presumption is overcome by showing either that petitioner's counsel's "conduct was not, in fact, part of a strategy or by showing that the strategy employed was unsound." Thomas v. Varner, 428 F.3d 491, 499-500 (3d Cir. 2005). When the record does not disclose counsel's actual strategy, the presumption is rebutted by a "showing that no sound strategy . . . could have supported the conduct." Id. at 500.

To prove prejudice, a convicted defendant must affirmatively prove that counsel's alleged errors "actually had an adverse effect on the defense." Strickland, 466 U.S. at 693.

11

"The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Here, if Petitioner fails to satisfy either prong of the Strickland test, his claim will fail. Id. at 697.

### 2.   Analysis

In reviewing Petitioner's proffered mental health evidence, Judge Sitarski acknowledged that some of the evidence may have been relevant--for instance, to prove that Petitioner had a subjective belief of imminent danger, or that he acted in the heat of passion. R&R 18, 20, ECF No. 84. Despite this potential relevance, however, Judge Sitarski found that the evidence would have undermined counsel's strategy of actual innocence, and would not have been sufficient to support the defenses of imperfect self-defense,[3] provocation and passion, and diminished capacity.

---

[3]     Petitioner does not object to the Judge's recommendation that habeas relief be denied on the claim of imperfect self-defense--perhaps given that the mental health evidence clearly indicates that Petitioner (1) continued the difficulty which resulted in the killing and (2) violated his duty to retreat. R&R 17, ECF No. 84. **Thus, the Court will focus only on Petitioner's objections to Judge Sitarski's treatment of the other two defenses.**

a.  Actual Innocence

Although the record does not reveal the entirety of counsel's trial strategy, Judge Sitarski found that counsel's strategy was at least substantially focused on proving actual innocence--a strategy that would be undermined by the presentation of mental health evidence. R&R 21, ECF No. 84. In situations like this, where the record does not clearly reveal counsel's actual strategy, the court presumes that "counsel's conduct might have been part of a sound strategy." Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005) ("In opposing petitioner's attempt to disprove the existence of a possible sound strategy, it is entirely proper for the Commonwealth to engage in record-based speculation as to what counsel's strategy might have been." Id. at 500 n.8.). This presumption can be overcome "by showing either that the conduct was not, in fact, part of a strategy or by showing that the strategy employed was unsound." Id.

Petitioner objects to Judge Sitarski's ruling on counsel's apparent strategy, and argues that counsel's strategy was not primarily focused on actual innocence. Mem. Supp. Habeas Pet. 9, ECF No. 58. According to Petitioner, counsel explicitly stated his strategy prior to trial: when responding to the Commonwealth's argument that the defense should not be able to

refer to certain evidence unless self-defense was an issue in the case, counsel stated that "the Defense is not ruling out self-defense. Clearly there are issues of self-defense brought out by the Commonwealth's own witnesses." Id. at 10. This, Petitioner contends, reveals trial counsel's commitment to a strategy of self-defense or lesser-degree homicide. Id. Petitioner makes other arguments along those lines--observing that the attorney never told the jury that his client was not present when the decedent was murdered; that the attorney elicited evidence of intoxication that potentially pointed to the decedent as the aggressor; and that the attorney's closing argument included a statement indicating that the facts established at most a case of voluntary manslaughter, not murder. Id. at 10-11.

Thus, according to the Petitioner, counsel presented the jury with two options: "find Petitioner not guilty because the Commonwealth failed to prove Petitioner's guilt beyond a reasonable doubt, or, in the alternative, find Petitioner guilty of voluntary manslaughter because the unfortunate incident was the result of Petitioner's overreaction to the decedent's acts of aggression." Id. at 12. Petitioner argues that, under Strickland, counsel was required to present both of these alternate theories in a constitutionally competent manner--and he failed to do so. Id.

14

Trial counsel focused at least significantly on proving Petitioner's innocence, however, as demonstrated by his attacking the credibility of the Commonwealth's sole eyewitness, and by raising the inference that the eyewitness himself was the killer. R&R 21, ECF No. 84. Moreover, a pre-trial remark by counsel that self-defense should not be ruled out does not constitute definitive proof that actual innocence was not one of counsel's primary strategies. The Commonwealth's whole case rested on that one eyewitness, a man that initially denied any knowledge of the incident. Id. at 22. The murder weapon had not been found, and Petitioner insisted to counsel that he was innocent. Id. Under the facts, it was reasonable for counsel to pursue a strategy of actual innocence.

With regard to a provocation and passion defense, Judge Sitarski observes that "mental health evidence showing that Petitioner's mental issues might cause him to lose the ability for cool reflection would undermine, rather than support, his claim of factual innocence." Id. Similarly, for the limited defense of diminished capacity--which entails proving a defendant lacks the capacity to form the specific intent to kill, in order to reduce the conviction to third-degree murder-- the Petitioner must "admit general culpability," Jacobs v. Horn, 395 F.3d 92, 107 (3d Cir. 2005), which would also undercut counsel's actual innocence strategy. Accordingly, "even if there

15

is evidence to support a diminished capacity defense, it is reasonable for an attorney to pursue an innocence defense when the defendant denies the killing." Hughes v. Beard, No. 06-250, 2007 WL 2791423, at *24 (E.D. Pa. Sept. 25, 2007). Overall, Petitioner has failed to rebut the presumption afforded to counsel's tactical decisions. See Thomas, 428 F.3d at 500.

    b.  No Prejudice

        Nevertheless, even assuming that counsel should have pursued the limited defenses of provocation and passion manslaughter and of diminished capacity, the proffered mental health and family history evidence does not enable Petitioner to make out all of the required elements of those defenses. In other words, Petitioner was not prejudiced by counsel's decision not to develop and deploy mental health evidence.

        For provocation and passion manslaughter, psychiatric evidence is only relevant as to whether Petitioner had been acting in the "heat of passion"--it does not apply to the objective provocation inquiry. See Commonwealth v. Miller, 987 A.2d 638, 652 (Pa. 2009) (holding expert testimony on mental health irrelevant to the issue of provocation). Although Petitioner relies on this psychiatric evidence to explain the "heat of passion" that drove him to stab the victim at least sixteen times (R&R 24, ECF No. 84), he makes no effort to argue

16

that there was either objectively reasonable provocation or insufficient cooling time. See Commonwealth v. Galloway, 485 A.2d 776, 783 (Pa. Super. 1984) ("Whether the provocation was sufficient to support the defense of voluntary manslaughter is determined by an objective standard--whether a reasonable man, confronted by the same series of events, would become impassioned to the extent that his mind was incapable of cool reflection." (citing Commonwealth v. McCusker, 292 A.2d 286 (Pa. 1972)). Petitioner has not made the requisite objective showing of sufficient legal provocation, and counsel was not ineffective for failing to investigate and present such evidence when there is no evidence to support the remaining factors. See Wertz v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (finding counsel not ineffective for failing to pursue a meritless claim); Commonwealth v. Busanet, 54 A.3d 35, 44 (Pa. 2012) (finding no ineffectiveness for failing to investigate and present mental health evidence to support imperfect self-defense when there was no evidence supporting the other factors).

For diminished capacity, as Judge Sitarski observes, Petitioner has not shown a reasonable probability that the result of the trial would have been different, given that the trial record contains substantial evidence that he did in fact form a specific intent to kill. R&R 24, ECF No. 84. See Zettlemoyer v. Fulcomer, 923 F.2d 284, 295-96 (3d Cir. 1991)

("Evidence of specific intent to kill may disprove the defense of diminished capacity."). Under Pennsylvania law, "specific intent to kill may be demonstrated by nothing more than use of a deadly weapon upon a vital part of the body." <u>Whitney v. Horn</u>, 280 F.3d 240, 259 (3d Cir. 2002); <u>id.</u> at 297 (cataloguing instances in Pennsylvania where multiple stab wounds established specific intent). Here, Petitioner chased down the fleeing victim and stabbed him at least sixteen times--notably, once through the heart. R&R 24, ECF No. 84. The record sufficiently demonstrates that Petitioner had specific intent to kill, and Petitioner cannot prove that he was prejudiced by counsel's failure to investigate and present psychiatric evidence to pursue a diminished capacity defense.

Because counsel's actual innocence strategy was reasonable, and given that Petitioner was not prejudiced by counsel's tactical omissions, counsel cannot be deemed ineffective for failing to investigate and present mental health evidence at trial. Therefore, the Court will deny habeas relief on Claim A.

B.   Claim B: The Prosecutor Used His Peremptory Challenges
     in a Racially Discriminatory Manner; Counsel Were
     Ineffective at Trial and on Direct Appeal

Petitioner claims that the Commonwealth violated
Batson v. Kentucky, 476 U.S. 76 (1986), by using peremptory jury
strikes in a racially discriminatory manner. Mem. Supp. Habeas
Pet. 28, ECF No. 58. Alternatively, Petitioner claims that trial
and appellate counsel were ineffective for failing to object to
the prosecutor's discriminatory strikes, where the record
reflects such discriminatory treatment. Id.

"The Equal Protection Clause 'prohibits a prosecutor
from using a peremptory challenge to strike a prospective juror
solely on account of race.'" Coombs v. Diguglielmo, 616 F.3d
255, 261 (3d Cir. 2010) (quoting Holloway v. Horn, 355 F.3d 707,
719 (3d Cir. 2004)). The Supreme Court has set forth a three-
part test to determine if a Batson violation has occurred:

> When a Batson challenge is raised, "[f]irst,
> the trial court must determine whether the
> defendant has made a prima facie showing
> that the prosecutor exercised a peremptory
> challenge on the basis of race." Rice v.
> Collins, 546 U.S. 333, 338 (2006). "Second,
> if the showing is made, the burden shifts to
> the prosecutor to present a race-neutral
> explanation for striking the juror in
> question." Id. (citing Batson, 476 U.S. at
> 97-98). "Third, the court must then
> determine whether the defendant has carried
> his burden of proving purposeful

discrimination." Id. (citing Batson, 476
U.S. at 98).

Coombs, 616 F.3d at 261. The Third Circuit has emphasized that a petitioner's bald assertion of prejudice does not constitute sufficient "information to establish a prima facie case of racial discrimination in the exercise of peremptory strikes." Lewis v. Horn, 581 F.3d 92, 104 (3d Cir. 2009). Additionally, although the prosecution bears the burden of production of the race-neutral reason at step two, the burden of persuasion remains with the opponent of the peremptory strike. Purkett v. Elem, 514 U.S. 765,768 (1995) (per curiam).

After reviewing the trial court's holdings and analyzing each of the three steps, Judge Sitarski found that Petitioner failed to establish a Batson violation, and that counsel were not ineffective for failing to raise a Batson claim at trial and on appeal. R&R 33-34, ECF No. 84. For the reasons outlined below, the Court agrees.

1.   Step 1: Prima Facie Showing

At trial, Petitioner's attorney objected to the Commonwealth's use of a peremptory challenge to strike a young African-American male named James Story--and counsel asked that the District Attorney indicate for the record whether there was

any racial motive for the disqualification.[4] Id. at 26. The

trial judge expressly found that there was no pattern of

exclusion,[5] and stated that the prosecutor was not required to

_____

[4]      Although Respondents argue that this was insufficient
to meet the "contemporaneous objection" requirement to preserve
his Batson claim, see Abu-Jamal v. Horn, 520 F.3d 272, 279-84
(3d Cir. 2008) (holding that a timely objection is required to
preserve a Batson claim) cert. granted, judgment vacated sub
nom. Beard v. Abu-Jamal, 558 U.S. 1143 (2010) (vacated on other
grounds), Judge Sitarski found that the objection had been
properly preserved as to Mr. Story, given that the court
understood the objection to be a race-based one. R&R 27 n.17,
ECF No. 84.

        Judge Sitarski did find, however, that Petitioner's
Batson claim as to other jurors is foreclosed, because he did
not properly object when they were stricken. Id. Petitioner
objects, and cites the recent Third Circuit case of Williams v.
Beard, 637 F.3d 195, 208 n.12 (3d Cir. 2011), which held that
"all that Abu-Jamal requires" is that a petitioner have
"unequivocally put the trial court on notice of his equal
protection challenge." In Williams, the petitioner objected to
only two of the peremptory strikes, but the court held that
those objections provided sufficient notice for the court, which
"allowed the court to inquire as necessary"--and which permitted
the Petitioner to raise Batson claims as to other jurors as
well. Id.

        Petitioner argues, accordingly, that his Batson claim
as to the striking of Angelnett Watson and Angela Heath should
not be foreclosed. Pet'r's Objections 19, ECF No. 88. Even
assuming Petitioner is correct, however, it does not change the
fact that (1) he has not made a prima facie showing of
discrimination, and that (2) he has not met his ultimate burden
of persuasion. Considering the additional strikes of these other
jurors does not alter the analysis, and thus Petitioner's
argument on this point is unavailing.

[5]      Petitioner objects to the trial judge's statement that
there was no prima facie case because there was "no systematic
pattern of exclusion" on the grounds that "systematic" exclusion
is a higher burden of proof than Batson requires. Pet'r's
Objections 17, ECF No. 88. Petitioner notes that "'systematic'
exclusion is the 'crippling burden of proof' previously imposed

offer a race-neutral reason. Id. at 27. Thus, the trial judge found that Petitioner had not made out a prima facie case for a Batson violation, and that it was not necessary to proceed to steps two and three. Id. Petitioner asserts that the trial judge was in error, and argues that statistical evidence as well as evidence of a culture of discrimination within the prosecutor's office both establish a prima facie showing of the prosecutor's discriminatory strike. Pet'r's Objections 16, ECF No. 88.

a. Statistical Evidence

Petitioner claims that statistical evidence indicates a pattern of strikes against black jurors in this case. Mem. Supp. Habeas Pet. 30, ECF No. 58. The Third Circuit has stated that statistical evidence, such as "strike rates" and "exclusion rates," is relevant to the Batson inquiry.[6] Abu-Jamal, 520 F.3d

_____

by Swain v. Alabama, 380 U.S. 202 (1965), which Batson rejected. Batson, 476 U.S. at 92." Pet'r's Objections 17, ECF No. 88. Regardless of the trial judge's word choice, however, Petitioner has made no indication that the trial judge was applying the pre-Batson approach of requiring a pattern of "systematic" discriminatory strikes over a series of cases. More likely, the trial judge was noting that the prosecutor himself had not displayed a systematic pattern of excessively striking African-American jurors. In any event, Petitioner clearly did not make out a prima facie case on these facts, and thus this argument is doubly unavailing.

[6]     The Third Circuit explained the difference between the two metrics as follows:

The strike rate is computed by comparing the number of peremptory strikes the prosecutor

at 290. In this instance, however, Judge Sitarski found that the evidence Petitioner offers does not support an inference of racial discrimination. R&R 28, ECF No. 84.

Petitioner states that the jury panel consisted of thirty-seven people: twelve African-Americans (33%), twenty-three whites (62%), and two of unknown race.[7] Mem. Supp. Habeas Pet. 31, ECF No. 58. The prosecutor exercised seven out of seventeen total strikes against African-American jurors, for a strike rate of 41%. Id. In Abu-Jamal, the Third Circuit noted that it had never found an inference of discrimination based on a strike rate even as low as 66.67%. Abu-Jamal, 520 F.3d at 293. Here, the strike rate is significantly lower than that--and it does not evince a pattern of discrimination. Similarly, seven out of the twelve total African-Americans in Mr. Story's venire

_____

> used to remove black potential jurors with the prosecutor's total number of peremptory strikes exercised. This statistical computation differs from the "exclusion rate," which is calculated by comparing the percentage of exercised challenges used against black potential jurors with the percentage of black potential jurors known to be in the venire.

Abu-Jamal, 520 F.3d at 290.

[7]    Although Judge Sitarski noted that "[m]uch of Petitioner's statistical evidence, garnered from his own independent investigation, is not based on record evidence and is disputed by Respondents," she assumed, arguendo, the accuracy of the data--given that she still found that Petitioner's claim fails. R&R 28 n.21, ECF No. 84.

were challenged, for an exclusion rate of 58.3%. This also does
not raise an inference of discrimination. This is not an
instance where all, or even most, of Petitioner's racial group
was excluded--as is often the case in successful Batson
challenges based on exclusion rates. See Jones v. West, 555 F.3d
90, 98 (2d Cir. 2009) (cataloguing cases from different
jurisdictions that involved successful challenges, and noting
that the exclusion rates have typically included patterns in
which members of the racial group are all or almost all excluded
from the jury). This statistical evidence is simply not strong
enough to make out a prima facie Batson showing--as is
underscored by the fact that Petitioner offered no particular
counterarguments or objections to this point of Judge Sitarski's
report. Pet'r's Objections 15-20, ECF No. 88.

b. Culture of Discrimination

Petitioner also claims that evidence of a "culture of
discrimination" within the Philadelphia District Attorney's
Office supports his Batson claim. In particular, Petitioner
references a training tape made in 1987 by former Assistant
District Attorney Jack McMahon in which he encourages picking
non-African-American jurors. Mem. Supp. Habeas Pet. 32-33, ECF
No. 58. Petitioner also points to the notes of Assistant
District Attorney Gavin Lentz, which were taken during a jury

24

selection training by Director of Training Bruce Sagel in August
of 1990. Id. at 34-35. As Judge Sitarski observes, however, the
tape and lecture are "no substitute for the 'concrete, case
specific information that is necessary to demonstrate a prima
facie Batson violation.'" R&R 29, ECF No. 84 (quoting Lewis, 581
F.3d at 104); see also Peterkin v. Horn, 988 F. Supp. 534, 540-
41 (E.D. Pa. 1997) (finding that the McMahon tape did not
suffice to raise inference of discrimination).

        Courts in this District have recognized that
"discriminatory intent cannot be inferred from the mere
existence of the training video"; where the prosecutor at issue
was not involved in the lecture or tape, "the courts have
required some evidence of a link between that attorney and the
tape." Rollins v. Horn, No. 00-1288, 2006 WL 2504307, at *4
(E.D. Pa. Aug. 17, 2007). Petitioner has not presented any facts
that support any direct link between the prosecutor in his case
and the training video, nor has he shown anything suggesting
that the prosecutor in his case was aware of or attended the
alleged lecture. Accordingly, as with Petitioner's proffered
statistical evidence, the mere existence of the video and
lecture is not sufficient to make out a prima facie Batson
claim.

2.   Step 2: Race-Neutral Explanation

Once the trial court found that there was no prima facie <u>Batson</u> claim, the prosecutor requested that he be permitted to offer his race-neutral reasons; the trial judge allowed him to do so, but noted that the prosecutor was not required to provide one. R&R 30, ECF No. 84. The prosecutor stated that he challenged Mr. Story because his age and gender were similar to Petitioner's. Id. at 8. The trial judge elected not to proceed to step three to determine the ultimate question of discrimination, presumably based on Petitioner's failure to establish a prima facie case. <u>See</u> <u>Holloway</u>, 355 F.3d at 724 (finding trial judge implicitly found no prima facie case by proceeding to trial).

This situation is somewhat unique, however, in that the trial court expressly found that Petitioner did not make out a prima facie case, and yet the prosecutor still offered his race-neutral justifications. Looking to guidance from Supreme Court and Third Circuit precedent,[8] Judge Sitarski determined

_____

[8]      The relevant passage of Judge Sitarski's report goes as follows:

As the Supreme Court explained:

Once a prosecutor has offered a race-neutral explanation for the peremptory challenges <u>and</u> the trial court has ruled on the ultimate question of intentional

26

that the prima facie inquiry may have become moot when the

prosecutor put his race-neutral reasons on the record and the

---

> discrimination, the preliminary
> issue of whether a defendant had
> made a prima facie showing becomes
> moot.
>
> Johnson v. Love, 40 F.3d 658, 664 (3d Cir.
> 1994) (quoting Hernandez v. New York, 500
> U.S. 352, 359 (1991)) (emphasis added).
> Here, only one of the requirements for
> mooting a prima facie case has been met, as
> the trial court did not rule on the ultimate
> question of intentional discrimination.
>
> However, in Holloway v. Horn, the Third
> Circuit was faced with a similar situation:
> the trial court implicitly found that the
> defendant had failed to make out a prima
> facie case, but the prosecution still set
> forth their race-neutral reasons. 355 F.3d
> at 723. The Third Circuit found that the
> prima facie inquiry was moot, noting that
> "based on the prosecutor's explanations
> alone, the trial court should have reached
> the second and third steps in the Batson
> inquiry in this case." Id. at 724. As a
> result, the Third Circuit proceeded to
> analyze the second and third steps de novo.
>
> Thus, pursuant to Holloway, the prima
> facie inquiry may have become moot once the
> prosecutor was permitted to set forth his
> race-neutral reasons for the record. See
> Hernandez, 500 U.S. at 539 ("where the
> defendant has done everything that would be
> required of him if the plaintiff had
> properly made out a prima facie case,
> whether the plaintiff really did so is no
> longer relevant."). As a result, this Court
> will undertake de novo review of steps two
> and three.

R&R 30-31.

trial court declined to rule on the ultimate question of intentional discrimination. R&R 30-31, ECF No. 84. Accordingly, Judge Sitarski undertook a de novo review of steps two and three. Id. at 31-33.

At step two, the Commonwealth bears the burden of producing a race-neutral reason for the peremptory challenges. Here, the prosecutor cited Mr. Story's age and gender as his non-discriminatory reasons. Age is generally considered an appropriate race-neutral justification for a peremptory strike. United States v. Edwards, 264 F. App'x 139, 144 (3d Cir. 2008); see also United States v. Mack, 78 F. App'x 171, 180 (3d Cir. 2003) (finding peremptory challenges based upon age as legitimate and race neutral). Following Petitioner's trial, however, the Supreme Court decided J.E.B. v Alabama ex el. T.B., 511 U.S. 127 (1994), in which it extended Batson to prohibit peremptory strikes based on gender. Nevertheless, the Supreme Court subsequently held that, although peremptory challenges based on gender alone are prohibited, the step two burden may be met if the prosecutor offered other, race-neutral reasons. Rice v. Collins, 546 U.S. 333, 341 (2006). Judge Sitarski found that the prosecutor's age-based reason was sufficient to carry the prosecutor's burden (R&R 32, ECF No. 84), and the Petitioner offers no counterargument to her application of Rice in this way. Pet'r's Objections 18, ECF No. 88. Because the prosecutor

28

here offered age as an acceptable race-neutral reason, Judge
Sitarski properly found that "the prosecutor's relatively light
step two burden has been met." R&R 32, ECF No. 84.

### 3.   Step 3: Proving Purposeful Discrimination

With regard to step three, Petitioner argues that the
age-based justification was pretextual because Mr. Story was
actually fifteen years younger than Petitioner. Mem. Supp.
Habeas Pet. 37, ECF No. 58. The record reveals, however, that
Mr. Story did not state his age. R&R 33, ECF No. 84. Thus, the
prosecutor was permitted to gauge the general age of Mr. Story
from his appearance and answers. See Lark v. Beard, No. 01-1252,
2012 WL 3089356, at *8 n.6 (E.D. Pa. July 30, 2012) (noting that
general age for each venireman could be determined from
appearance or extrapolating from answers to testimony).

Petitioner asserts that, during voir dire, Mr. Story
did state that "he had only been working at a fish-market for a
few years after completing two years of college." Pet'r's
Objections 18, ECF No. 88. According to Petitioner, this should
have definitively revealed the age disparity to the prosecutor--
and thus, the reason was pretextual. Id. However, people enroll
in college at varying ages, and it is unclear what Mr. Story
precisely meant by "a few years" in regard to his work at the
fish market. This statement alone does not clearly indicate Mr.

Story's age. Petitioner's evidence does not demonstrate that the prosecution was aware that Mr. Story was significantly younger than Petitioner, and Petitioner has not pointed to anything else that leads to a finding that age was a pretext for racial discrimination.

As Judge Sitarski aptly observed, "it will be a rare situation in which the prosecutor's race-neutral reason establishes racial discrimination when the evidence of record is not sufficient to establish a prima facie case. See Baxter v. United States, 640 A.2d 714, 717-18 (D.C. 1994) (the trial court did not commit plain error by declining to hold that the jury had been unconstitutionally selected, as age-based peremptory strikes were constitutionally permissible and the issue of sex-based peremptory strikes had not been decided); cf. United States v. Stephens, 421 F.3d 503, 513 n.2 (7th Cir. 2005) ("Evidence sufficient to prove discrimination at the third step is necessarily sufficient to establish an inference at the first step of Batson . . . [t]he reverse, however, is not true.")." R&R 33, ECF No. 84. Judge Sitarski correctly found that the evidence cited by the Petitioner "could not raise an inference of discrimination, much less meet the ultimate burden of persuasion." Id.

Relatedly, Petitioner brings an IAC claim against his trial counsel for failure to renew his Batson objection and to

request further investigation of the Commonwealth's peremptory challenges. Mem. Supp. Habeas Pet. 39, ECF No. 58. Petitioner also raises a claim against his appellate counsel for failure to raise a Batson claim on appeal. Id. at 40. Because the underlying Batson claim is without merit, however, neither trial nor appellate counsel could have been ineffective for failure to assert a Batson claim. Accordingly, the Court will deny habeas relief on Claim B.

> C.     Claim C: The Prosecutor's Closing Argument Violated
>        Due Process; Trial Counsel Was Ineffective for Failing
>        to Object to the Improper Argument

Petitioner argues that certain statements the prosecutor made in his closing argument individually and cumulatively violated his due process rights. Mem. Supp. Habeas Pet. 41, ECF No. 58. Petitioner also asserts an IAC claim against trial counsel for failure to object to several of these statements. Id.

A petitioner may qualify for federal habeas relief if acts of prosecutorial misconduct "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." Greer v. Miller, 483 U.S. 756, 765 (1987) (internal quotation marks omitted). To constitute a due process violation, "the prosecutorial misconduct must be 'of sufficient

31

significance to result in the denial of the defendant's right to a trial.'" United States v. Bagley, 473 U.S. 667, 676 (1985) (quoting United States v. Agurs, 427 U.S. 97, 96 (1976)). It is not enough to prove that the prosecutor's remarks were "undesirable or inappropriate," Lesko v. Lehman, 925 F.2d 1527, 1546 (3d Cir. 1991) or even "universally condemned," Todaro v. Fulcomer, 944 F.2d 1079, 1082 (3d Cir. 1991) (internal citation omitted)--the petitioner must show that he was denied a fair trial. Smith v. Phillips, 455 U.S. 209, 221 (1982).

To evaluate whether a prosecutor's misconduct rose to the level of a constitutional violation, a court must examine the prosecutor's conduct in the context of the whole trial. Greer, 483 U.S. at 765-66; see Reid v. Beard, 420 F. App'x 156, 159 (3d Cir. 2011) ("A reviewing court must 'examine the prosecutor's offensive actions . . . [by] assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant.'") (internal citation omitted)). Overall, the misconduct must be sufficiently prejudicial in the context of the entire trial as to violate a petitioner's due process rights. Donnelly v. DeChristoforo, 416 U.S. 637, 639 (1974).

Petitioner asserts that the prosecutor committed misconduct through the following statements:

(a) Statements during direct examination and closing
arguments that referred to the military background of
eyewitness Hezekiah Sermons;

(b) Statements about why the Commonwealth did not call
Fred Brown as a witness;

(c) Statements that faulted Petitioner for failing to
produce evidence;

(d) Statements encouraging the jury to base its
verdict on sympathy for victim;

(e) Statements about the jury's duty to protect a
decent neighborhood and provide a solution to crime.

Mem. Supp. Habeas Pet. 42-46, ECF No. 58. The Court will address
each statement in turn, before treating their cumulative impact.

### 1.   Statements on Witness's Military Background

To begin with, Petitioner objects to the prosecutor's
references to the military background of Hezekiah Sermons, the
Commonwealth's only eyewitness. Id. at 42-43. During Mr.
Sermons' testimony, counsel objected to the prosecutor's
inquiries into his military service and to the repeated
references to him as "Private Sermons." Id. The court ruled that
the witness's background was irrelevant, and instructed the jury
that "title, position in the community or occupation had no
relevance on a fact witness's ability to perceive events." Id.

33

at 43. During closing argument, counsel also objected to the
prosecutor's reference to Mr. Sermons' travel from Germany to
testify at the trial. Id. The court issued a curative
instruction to the jury, directing them to draw inferences only
from facts in evidence as they recollect them. R&R 37, ECF No.
84. Petitioner argues that these statements were impermissible[9]
attempts to bolster the witness's credibility, and that they
prejudiced him and violated his due process rights. Mem. Supp.
Habeas Pet. 44, ECF No. 58.

Although Mr. Sermons was undoubtedly an important
witness--as the only eyewitness who testified at trial--the
reference to Mr. Sermons as "Private Sermons" and the statements
that he had returned from Germany to testify did not "so infect
the trial with unfairness as to make the resulting conviction a
denial of due process." Greer, 483 U.S. at 765. For one thing,
Petitioner has offered no support for the conclusion that

---

[9]        Judge Sitarski notes the following:

        Petitioner first argues that this statement
        violated Pennsylvania law, "which forbids
        testimony that either attacks or bolsters a
        witness'[s] testimony by commenting on that
        witness'[s] credibility." (Supp. Pet. at
        44). To the extent Petitioner argues that he
        is entitled to relief for violations of
        state law, such a claim is not cognizable on
        federal habeas review. Estelle v. McGuire,
        502 U.S. 62, 67-68 (1991).

R&R 38, ECF No. 84.

34

referring to Mr. Sermons' military background would necessarily afford him higher credibility--and other courts have held that it does not. See People of Illinois v. Lane, 922 N.E.2d 575, 586 (Ill. App. Ct. 2010) ("We do not believe that support for the members of the military automatically accords them a higher degree of credibility as witnesses."); see also Lloyd v. Riley, No. 88-2847, 1990 WL 59592, at *2 (E.D.N.Y. May 3, 1990) (denying habeas petitioner's argument that it was error to allow prosecution witnesses to testify in military uniform). Moreover, the trial court took several measures to cure any potential prejudice, including instructing the jury to disregard Mr. Sermons' military service in their credibility determination. See United States v. Vaghari, 500 F. App'x 139, 147 (3d Cir. 2012) (noting that a court's cautioning by curative instructions may cure a prosecutor's misconduct); Datsko v. City of Philadelphia, No. 93-4746, 1995 WL 574364, at *1-2 (E.D. Pa. Sept. 26, 1995) (declining to prohibit witnesses from testifying in uniform and noting that any possible prejudice could be corrected with proper jury instructions) (collecting cases).

With regard to the prosecutor's statement in closing that Mr. Sermons traveled from Germany to testify, Judge Sitarski similarly found that it was not prejudicial, given that it was an attempt to respond to defense counsel's assertion that Mr. Sermons was afraid to come forward as a witness. R&R 39, ECF

35

No. 84. Petitioner argues, however, that the prosecutor's comment constituted unlawful "vouching" for Mr. Sermons' credibility. "A prosecutor commits misconduct by vouching when she: (1) assures the jury that the testimony of a government witness is credible; and (2) bases that assurance on either her claimed personal knowledge or other information not contained in the record." United States v. Crawford, 498 F. App'x 163, 166 (3d Cir. 2012) (internal quotation marks omitted).

Here, the prosecutor did not assure the jury that Mr. Sermons' testimony of the government witness was credible. Prosecutor's statement was an attempt to rebut counsel's particular attack on Mr. Sermons' credibility--again, counsel's suggestion that he feared to testify. Thus, the prosecutor did not commit misconduct by vouching. See, e.g., United States v. Walker, 155 F.3d 180, 188 (3d Cir. 1998) (finding no vouching or misconduct for statement: "Now ask yourselves what motivation would officer Robert Scott and former Officer Raymond Dubois have to come in here and lie to you. What motivation."). Additionally, as previously stated, any prejudice from the prosecutor's statement concerning Germany was immediately alleviated by the trial court's curative instruction. Accordingly, Petitioner cannot show that these statements so infected the trial with prejudice as to violate due process.

2.   Statement about Petitioner's Failure to Call Fred
     Brown

Petitioner next claims that the prosecutor's comments
regarding Fred Brown's failure to testify constituted
prosecutorial misconduct. Although the prosecutor stated in his
opening that he would call a witness to the stand named Fred
Brown--the victim's cousin, and the other man involved in the
initial altercation with the Petitioner--in his closing he
remarked that he did not call Mr. Brown because he was unlikely
to tell the truth (due to his involvement in his cousin's
death). Mem. Supp. Habeas Pet. 44-45, ECF No. 58. The prosecutor
also mentioned that the Petitioner "had every bit of a right to
call him as we did." Id. at 45. Petitioner asserts that these
statements were improper because: (1) the prosecutor's reason
for not calling Mr. Brown was not supported by evidence on the
record, and (2) because the prosecutor "chastised the defense
for not presenting Mr. Brown as a witness." Id.

As Judge Sitarski concluded, the prosecutor's stated
reason for calling Mr. Brown was a fair inference to draw from
the evidence of record. R&R 41, ECF No. 84. Officer Palmer
testified during trial that Fred Brown had come up to him
shortly after the police arrived and stated that the victim was
his cousin, and that he had been stabbed (N.T. 9/11/89 at 65);

37

Officer Palmer also testified that Mr. Brown appeared sweaty and excited (Id. at 69); and Mr. Sermons testified that the victim, and another man (Brown), had attacked Petitioner (See generally N.T. 9/11/89). Thus, the prosecutor's proffered reason for not calling Brown was a "fair comment and reasonable inference for the jury to draw from the evidence of record. See United States v. Reilly, 33 F.3d 1396, 1422 (3d Cir. 1994) (finding no prosecutorial misconduct when comment was an inference that was supported by evidence presented)." R&R 41, ECF No. 84.

Additionally, Petitioner claims that the prosecution improperly rebuked the defense for not calling Mr. Brown as a witness. Mem. Supp. Habeas Pet. 45, ECF No. 58 (citing the transcript at N.T. 9/12/89 85-86). Any potential prejudice that may have resulted from this comment was mitigated by the prosecutor's following remark that Petitioner had "no obligation and no duty to prove anything or call anyone." See N.T. 9/12/89 at 85-86. Moreover, the prosecutor was permitted to explain why he did not call Mr. Brown, as a rebuttal to defense counsel's argument in closing: that the prosecutor did not call Mr. Brown out of fear that he would testify that he had identified Mr. Sermons to the police as the actual killer. R&R 42, ECF No. 84; see United States v. Stewart, 378 F. App'x 201, 205 (3d Cir. 2010) (finding no misconduct when a prosecutor commented that the defense could have introduced certain evidence, because such

38

a comment was made in response to the defense's claim that such evidence would have harmed the prosecutor's case). In his objections to Judge Sitarski's report, Petitioner fails to offer any counterarguments to Judge Sitarski's findings relating to these statements. Again, Petitioner cannot show that these statements so infected the trial with prejudice as to violate due process.

### 3. Statement Faulting Petitioner for Failing to Produce Witnesses or Evidence

Petitioner objects to another statement made in the prosecutor's closing argument: "[d]id you hear any of that testimony, or was that Mr. Alva telling you things in his opening that now he wants you to believe is the evidence, is the truth?" Mem. Supp. Habeas Pet. 45, ECF No. 58. Petitioner asserts that this constituted prosecutorial misconduct because the prosecutor essentially "argued that the jury should fault Petitioner for his failure to call witnesses or present evidence." Id. However, with this statement, the prosecutor was merely observing that defense counsel did not present the evidence he claimed in his opening that he would produce. It is well settled that a prosecutor may attempt "to focus the jury's attention on holes in the defense's theory." United States v. Balter, 91 F.3d 427, 441 (3d Cir. 1996). Taken in context, the

prosecutor was properly referencing gaps in Petitioner's theory
of events in light of the evidence that had, and had not, been
offered at trial. R&R 43, ECF No. 84. Thus, there was nothing
improper about this statement, nor did it prejudice the
Petitioner to the point of a due process violation.

4.   Statement Suggesting that the Jury Base Their
     Verdict on Sympathy for the Victim

Petitioner also asserts that the prosecutor's
statement that "[n]o one should die the way that Clarence
Woodlock died" constituted prosecutorial misconduct, as it
encouraged the jury to base its verdict on sympathy for the
victim. Id. at 45-46. This comment did not render the trial
unfair, however, and any potential prejudice that may have
resulted from this remark was cured by the closing jury
instruction that its "determination of the facts should not be
based on sympathy or prejudice either for or against the
defendant or for or against the victim." Id.; see United States
v. Homer, 545 F.2d 864, 868 (3d Cir. 1976) (finding no prejudice
when court instructed jury that they should determine issues of
fact without bias, sympathy, or prejudice).

40

5.    Statements About Juror's Duty to Protect Decent
      Neighborhoods and Provide Solution to Crime

Petitioner claims prosecutorial misconduct of the
prosecutor's suggestion that the jury had a duty to find
Petitioner guilty in order to protect those who lived in a
"decent neighborhood" and to be a part of the solution to crime
in Philadelphia. Mem. Supp. Habeas Pet. 46, ECF No. 58.
Petitioner argues that the prosecutor's "argument went far
beyond any fair response to the defense argument and evidence."
Pet'r's Reply Mem. Supp. Habeas Pet. 36, ECF No. 83.

As Judge Sitarski aptly observes, however, "the
prosecutor did not appeal to issues broader than the case, and
he appropriately linked his analogy to case-specific facts that
could be inferred from the testimony of record." R&R 45, ECF No.
84. The "problem" he described was Melvin Howard killing
Clarence Woodlock in a "decent" neighborhood--which could be
inferred from Mr. Sermons' testimony--and he asked the jury to
solve this problem with a guilty verdict. Id. The prosecutor's
remarks did not encourage the jury to decide the case on an
illegitimate basis; moreover, both the prosecutor and the trial
judge directed the jury to decide the case on the testimony of
record. Id. Overall, these comments were not so improper as to
constitute misconduct which "so infected the trial with

41

unfairness to make the resulting conviction a denial of due process." See Darden v. Wainwright, 477 U.S. 168, 180-83 & n.10 (1986)(finding no due process violation when prosecutor asked jury to sentence defendant to death to ensure public safety).

### 6.   Cumulative Prosecutorial Misconduct

Petitioner argues that the above comments not only individually infringed on his rights, but they also had a cumulative effect on the trial that violated due process. "The cumulative effect of prosecutorial misconduct . . . can rise to the level of a constitutional violation even if the individual instances of misconduct, standing alone, do not." LaBrake v. Stowitzky, No. 07-0212, 2009 WL 2854747, at *9 (E.D. Pa. Sept. 3, 2009). However, the comments were not individually improper or prejudicial, and Petitioner fails to establish that the cumulative effect of the prosecutor's statements infected the trial to such a degree that his due process rights were violated. To the extent any of the prosecutor's statements were improper, the prosecutor's own subsequent statements or the trial court's instructions cured any potential prejudice. See id. (finding no cumulative due process violation when the trial court issued curative instructions to remedy any errors). Accordingly, the Court will deny habeas relief on Claim C.

D.    Claim E: Ineffectiveness of Trial Counsel for Failure
      to Timely Request a Jury Instruction that the Jury
      Could Not Draw an Adverse Inference from Petitioner's
      Failure to Testify

In Carter v. Kentucky, 450 U.S. 288 (1981), the
Supreme Court held that a trial court must give a "no adverse
inference" jury instruction upon a defendant's request. See also
United States v. Simmons, 679 F.2d 1042, 1049 (3d Cir. 1982)
("[Carter requires] that the trial court must, at the request of
the defendant, instruct the jury that a defendant is not
compelled to testify and the fact that he or she does not
testify cannot be used as an inference of guilt."). However, a
defendant is constitutionally entitled to such an instruction
only upon request; thus, the onus falls upon defense counsel to
request the instruction unless there is a reasonable basis for
not doing so.

Petitioner asserts he was denied effective assistance
of counsel when his attorney failed to request a no-adverse-
inference instruction regarding his decision not to testify.
Mem. Supp. Habeas Pet. 58, ECF No. 58. At trial, the judge did
not include the no-adverse-inference charge, and although trial
counsel realized that he failed to request the instruction and

43

notified the judge accordingly, the jury reached a verdict before the judge could deliver the instruction. Id.

In its review of the trial court's judgment, the Pennsylvania Supreme Court concluded that: (1) the underlying claim had merit and the violation of Petitioner's rights was not harmless error; (2) counsel's performance was unreasonable; and (3) Petitioner failed to show that he was prejudiced by counsel's performance. Howard, 645 A.2d at 1306-08. Accordingly, the court denied this IAC claim.

As previously mentioned, IAC claims generally require application of the Strickland standard.[10] "It is past question that the rule set forth in Strickland qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Williams v. Taylor, 529 U.S. 362, 391 (2000). Accordingly, Petitioner may qualify for relief if the Pennsylvania Supreme Court's rejection of his claims was either "contrary to, or involved an unreasonable application of," the Strickland standard.[11] As reviewed below, Judge Sitarski inquired

---

[10]     Strickland also applies to IAC claims brought against appellate counsel. See Buehl v. Vaughn, 166 F.3d 163, 173-74 (3d Cir. 1999) (citing Strickland, 466 U.S. at 689).

[11]     With regard to the "contrary to" clause, the Pennsylvania Supreme Court addressed Claim E using the a three-pronged test for deciding IAC claims, which requires that: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for their action; and (3) the petitioner was prejudiced by the ineffectiveness. Howard, 645 A.2d at 1304

into whether the denial of Claim E constituted such an "unreasonable" application of Strickland.

### 1. Harmless Error

In this case, the Pennsylvania Supreme Court applied the Chapman harmless error standard in its review. The court noted that harmless error for purposes of direct review--as opposed to federal § 2254 review, as will be explained below-- places the burden on the government, and mandates that a defendant is entitled to relief unless the government can prove that the error was harmless "beyond a reasonable doubt" (citing Commonwealth v. Story, 383 A.2d 155 (Pa. 1978) (which adopted this standard as set forth by the United States Supreme Court in Chapman v. California, 386 U.S. 18 (1967))). The Pennsylvania Supreme Court found that the failure to give the no-adverse-inference instruction was not harmless under Chapman's reasonable doubt standard.[12] Howard, 645 A.2d at 1306. The court

_____

(quoting Commonwealth v. Rios, 920 A.2d 790, 799 (Pa. 2007)). The Third Circuit has held that this Pennsylvania ineffectiveness test does not contradict the Strickland standard. See Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000). Thus, the court's decision to apply the Pennsylvania three-part test was not "contrary to clearly established federal law."

[12]    The Pennsylvania Supreme Court observed that "in Commonwealth v. Lewis, 528 Pa. 440, 598 A.2d 975 (1991), [this Court] recognized that a failure to instruct the jury that no adverse inference could be drawn from the accused's failure to testify could never be harmless error when such instruction is timely requested." Howard, 645 A.2d at 1306. (Crucially,

emphasized, however, that finding error that is not harmless under <u>Chapman</u> does not of itself establish prejudice. <u>Id.</u> at 1307-08.

The Third Circuit has clearly held that a failure to give a no-adverse-inference instruction in violation of <u>Carter</u> is not structural error per se, but is subject to a harmless error analysis. <u>Lewis v. Pinchak</u>, 348 F.3d 355, 359 (3d Cir. 2003). Moreover, the applicable harmless error standard for federal habeas review is not controlled by <u>Chapman</u>, but is set forth in <u>Brecht v. Abrahamson</u>, which held that a court must inquire into "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. 619, 637 (1993) (citation omitted).

As this Court has previously noted, however, "[r]ather than applying the <u>Brecht</u> and <u>Strickland</u> tests separately, the Third Circuit has used the <u>Brecht</u> test to reach a conclusion regarding whether or not there has been ineffective assistance of counsel." <u>Pagliaccetti v. Kerestes</u>, 948 F. Supp. 2d 452, 458 (E.D. Pa. 2013).

---

however, the court in <u>Lewis</u> similarly applied what was essentially <u>Chapman</u> harmless error analysis--as opposed to the <u>Brecht</u> harmless error analysis that this Court must apply. <u>See</u> <u>Lewis</u>, 598 A.2d at 980-81.) In step with its decision in <u>Lewis</u>, the Pennsylvania Supreme Court found <u>Lewis</u>'s reasoning equally applicable to this case, and thus found that the violation did not constitute harmless error. <u>Howard</u>, 645 A.2d at 1306.

> [T]he ultimate issue under either test
> reduces to determining what effect, if any,
> the erroneous instruction had on the jury's
> verdict. Accordingly, if [the petitioner]
> demonstrates that the erroneous instruction
> had a substantial and injurious effect or
> influence in determining the jury's verdict,
> such that it was not harmless under Brecht,
> he has also demonstrated that there is a
> reasonable probability that but for
> counsel's unprofessional errors the result
> of the proceeding would have been different.

Id. (internal quotations omitted). Thus, for a federal court on habeas review, the harmless inquiry under Brecht is coextensive with Strickland's prejudice inquiry. With these harmless error distinctions sufficiently parsed, the Court will now turn to the performance and prejudice prongs of Strickland.

### 2.   Performance Prong

The Pennsylvania Supreme Court held that trial counsel's failure to timely request the no-adverse-inference instruction was unreasonable. Howard, 645 A.2d at 1307. As Judge Sitarski determined, this conclusion was a reasonable application of clearly established federal law. The record reveals that counsel did not have a strategic reason for not making the request--he unjustifiably failed to request the instruction until after the jury had started deliberating. In light of the significant risk that a jury may infer guilt from a failure to testify, as well as the fact that the risk would have

been mitigated by simply requesting the no-adverse-inference instruction, the Court concludes that the state court reasonably applied Strickland in finding that "trial counsel's failure to request the charge in a timely manner was unreasonable." Id.

### 3.  Prejudice Prong

Given that a district court on habeas review is required to apply the Brecht harmless error test even if the lower court applied the Chapman standard, see Hassine v. Zimmerman, 160 F.3d 941, 951-53 (3d Cir. 1998) (holding that a federal habeas court performing a harmless error inquiry on collateral review must employ the standard for harmless error articulated in Brecht), this Court will proceed to analyze the case under Brecht and Strickland to determine whether trial counsel's error was prejudicial or whether it was harmless. See Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (stating that the Brecht standard "subsumes" the "AEDPA/Chapman" test).

### a.  Review of the Evidence

To frame his discussion of whether counsel's failure to request a no-adverse-inference instruction was prejudicial, Judge Sitarski provided the following review of the evidence:

> At trial, the evidence against Petitioner consisted mainly of the testimony from one eyewitness: Hezekiah Sermons. On direct examination, Mr. Sermons testified

48

that prior to the day of the incident,
Petitioner was an acquaintance. N.T. 9/11/89
at 75. On the night of the murder (September
27, 1987), Mr. Sermons was walking to a
party when he saw Petitioner in an
altercation on the street with two men (one
of whom was the victim). Id. at 77. The
altercation ended when "three or four" guys
came to Petitioner's aid and chased the two
men away. Id. at 78. Mr. Sermons walked up
to the group, which included Petitioner and
the men who had chased away his attackers.
Id. Soon thereafter, the victim "came back
with a two-by-four and swung it at the
[petitioner]," but did not hit him. Id.

> At that time, the defendant pulled a
> knife and commenced to chase the
> decedent down the street. And about
> that time the three or four guys who
> initially had came to, I guess, help
> him in the altercation, chased after
> him with him. And being I had no reason
> to being there, I should have been just
> minding my own business, but I went
> along.

Id. Mr. Sermons then provided the following
testimony concerning the chase:

> Well, basically, he [Petitioner] chased
> him down 52nd Street onto this little
> street, Ludlow Street, and crossed into
> a vacant lot. And then the decedent, he
> got to the edge of Chestnut Street, and
> he fell off the curb. And that's when
> the [petitioner] caught up with him and
> threw a punch and knocked him down.

Id. After the victim fell into the middle of
the street, Petitioner began stabbing him in
the back. Mr. Sermons stated that when the
victim turned around to try to protect
himself, Petitioner then stabbed him
numerous times all over the body; "the final
time that he stabbed him, he clutched the
knife in both hands and stabbed the decedent

in the chest (indicating). That's when I seen blood shoot up out of the decedent's chest." Id. at 84-85.

Mr. Sermons testified that after Petitioner was done stabbing the victim, Petitioner "just said out loud that he was getting out of the area. He was going up his end, which is slang for going home." Id. at 85.

On cross-examination, trial counsel's strategy focused on pointing out the inconsistencies between Mr. Sermons' direct examination and his prior statements to police. N.T. 12/3/91 at 11-12. Specifically, three months after the murder, on December 28, 1987, the police went to Mr. Sermons' home and took him to the police station for questioning. During this first interview, Mr. Sermons denied any knowledge of the murder. N.T. 9/11/89 at 149. Defense counsel also elicited that Mr. Sermons had been taken to the police station and read his Miranda warnings, although Mr. Sermons denied that he felt like he was a suspect. Id. at 144-48.

Dr. Paul Hoyer also testified regarding his medical examination of the victim. Dr. Hoyer testified the victim was killed by sixteen knife wounds to the body. Id. at 217. Dr. Hoyer opined that only one knife was used. Id.

Arresting Officer Sgt. Joseph Smith testified that he arrested Petitioner in Moultrie, Georgia--where Petitioner had grown up and his mother lived at the time-- on January 28, 1988 (around four months after the incident occurred). Id. at 232. Sgt. Smith also testified that he believed Petitioner had been in the area for around two weeks. Id.

R&R 58-60, ECF No. 84.

Judge Sitarski concluded that the evidence presented at trial was legally sufficient to meet the Commonwealth's burden, and ultimately determined that Petitioner failed to establish that he is entitled to relief pursuant to <u>Brecht</u> and <u>Strickland</u>. The Court agrees, as will be discussed below.

b.  Petitioner Is Not Entitled to Habeas Relief

In <u>Carter</u>, the Supreme Court emphasized the risk of prejudice that may occur when a no-adverse-inference instruction is not given:

> Jurors are not experts in legal principles; to function effectively, and justly, they must be accurately instructed in the law. Such instructions are perhaps nowhere more important than in the context of the Fifth Amendment privilege against compulsory self-incrimination, since too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are . . . guilty of crime.

450 U.S. at 302 (internal quotation marks omitted). In this case, the trial judge did not deliver such a charge during closing jury instructions.

However, although the Pennsylvania Supreme Court found that trial counsel's failure to request a no-adverse-inference instruction was not harmless error and was objectively unreasonable, the court still found that Petitioner failed to show he was prejudiced by the error. <u>Howard</u>, 645 A.2d at 1306-

51

08. According to the court, "Appellant has not identified to this Court how he was in fact prejudiced. Nor can we discern from an independent review of the record how Appellant was prejudiced." Id. at 1308. Thus, the court denied Petitioner's IAC claim.

As previously mentioned, for purposes of this Court's AEDPA review of Claim E, "the pivotal question is whether the [Pennsylvania Supreme Court's] application of the Strickland standard was unreasonable." Harrington v. Richter, 562 U.S. 86, --, 131 S. Ct. 770, 785 (2011). However, "'an unreasonable application of federal law is different from an incorrect application of federal law.' Williams [v. Taylor], [529 U.S. 362,] 410 [(2000)]. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself." Harrington, 131 S.Ct. at 785. Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair-minded jurists could disagree' on the correctness of that decision." Harrington, 131 S.Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). This is a high hurdle for Petitioner to clear--and he has not cleared it.

In response to the Pennsylvania Supreme Court's indictment that he had not identified exactly how he was prejudiced, Petitioner now attempts to explain how he was

52

prejudiced by his attorney's failure to obtain a no-adverse-inference instruction. Specifically, he alleges that (1) the prosecutor urged the jury to consider Petitioner's silence as evidence of guilt; and (2) Petitioner's intent was the critical issue for the jury's determination, given that the evidence showed the victim was the initial aggressor. Mem. Supp. Habeas Pet. 63, ECF No. 58.

With respect to the first claim, it is true that a prosecutor's reference to a defendant's refusal to testify can result in prejudicial (and unconstitutional) error. See Griffin v. California, 380 U.S. 609, 614 (1965). Here, however, the prosecutor never stated that the Petitioner's failure to testify implied his guilt. The closest statement[13] that Petitioner points to is the prosecutor's comment in closing that Petitioner, when arrested, responded "which one," rather than denying the crime. N.T. 9/12/89 at 73. But as Judge Sitarski notes, "[t]aken in context, the prosecutor was not commenting on Petitioner's failure to testify, but rather on the oddity of his statement to police when arrested." R&R 61, ECF No. 84. Petitioner does not

---

[13]     Similarly, the other statements Petitioner relies on do not constitute impermissible invitations from the prosecutor for the jury to infer guilt from the Petitioner's decision not to testify. See N.T. 9/11/89, 234-35 ("Now, did he say anything else to you about him being down there?"); N.T. 9/12/89, 73 ("I didn't do this, I didn't do that. Is that what you heard the defendant said when the officer arrested him?")

dispute Judge Sitarski's characterization of this statement. With only conclusory declarations supporting this claim, Petitioner has not demonstrated that counsel's failure to request a no-adverse-inference instruction was rendered prejudicial by the prosecutor's comments.

With regard to the second argument, Petitioner's argument that his intent was the critical issue for the jury's determination is not persuasive. As was established above in the section on Claim A, defense counsel pursued a defense of actual innocence by attacking Mr. Sermons' credibility. Thus, in light of counsel's reasonable strategy, the critical issue was not whether Petitioner possessed a culpable intent, but whether Petitioner actually committed the crime. As Judge Sitarski notes, given that counsel's primary defense strategy was focused on attacking the credibility of Mr. Sermons, Petitioner's testimony was "not vital"[14] to that defense--further supporting the conclusion that Petitioner was not prejudiced. Id.

---

[14] Judge Sitarski found persuasive "the Pennsylvania Supreme Court's observation that situations where the no-adverse-inference instruction becomes especially important occur when 'the testimony of the accused is vital to the nature of the defense asserted,' such as a case where self[-]defense is asserted and the defendant's testimony would be vital." R&R 61, ECF. No. 84 (quoting Commonwealth v. Thompson, 543 Pa. 634, 643 (1996)). Although the jury in this case received instructions on voluntary manslaughter (including imperfect self-defense), it is clear that counsel's main defense of actual innocence depended on undermining Mr. Sermons' credibility--and Petitioner's testimony was not vital to pursue that objective.

Moreover, as Judge Sitarski observes, the no-adverse-inference instruction was given to each jury panel during voir dire. N.T. 9/5/89 at 26; 9/6/89 at 112-23; 9/7/89 at 118-19. Also, the court expressly stated to the jury in opening instructions that "Defendant has no obligation to offer evidence or to testify. Under the law, every defendant is presumed to be innocent, he has the right to remain silent" (N.T. 9/11/89 at 15). Although this latter instruction did not explicitly state that guilt should not be inferred from silence, it did reiterate that Petitioner had the right to choose not to testify.

Another court in this District confronted a similar no-adverse-inference IAC claim, and found that dismissal was supported by that fact that "[w]hile the trial court did not give a 'no adverse inference' instruction at the conclusion of trial, it did give such an instruction twice before any evidence was presented." Durham v. Piazza, No. 07-4338, 2011 WL 612724, at *4 (E.D. Pa. Feb. 11, 2011). As that court observed, "[a] jury is presumed to follow its instructions." Id. (quoting Weeks v. Angelone, 528 U.S. 225, 234 (2000)). This Court also finds that these preliminary instructions weigh heavily against a finding of prejudicial error.

Additionally, as Judge Sitarski concluded, the evidence presented at trial was legally sufficient to meet the Commonwealth's burden. Although the Commonwealth's case rested

55

on a single eyewitness, there was adequate evidence to support the verdict: Mr. Sermons' trial testimony, if found credible, was certainly compelling. Cf. Albrecht v. Horn, 485 F.3d 103, 128-29 (3d Cir. 2007) (finding that, although the determination was close, no prejudice arose from counsel's failure to request jury instruction because evidence of guilt was "ample"); Pagliaccetti, 948 F. Supp. 2d at 461 (finding petitioner could not establish that error was not harmless when there was significant evidence before the jury). The compelling and substantial nature of this evidence also weighs against a finding of prejudice.

Ultimately, in light of the compelling evidence of Petitioner's guilt, the trial judge's no-adverse-inference instructions during voir dire, and--most importantly--due to the fact that Petitioner has not shown how he was prejudiced by the error, the Court concludes that Petitioner cannot meet the Brecht harmless error test applied to due process violations or the IAC test under Strickland. The Petitioner has not demonstrated that counsel's error "had substantial and injurious effect or influence in determining the jury's verdict," and that the result would have been different but for the error. And even if fair-minded jurists might disagree over the Pennsylvania Supreme Court's decision, that is sufficient to preclude habeas relief. Petitioner has not demonstrated that court's decision

was an incorrect--much less an unreasonable--application of
Strickland. Thus, the Court will deny habeas relief on Claim E.


**V.    CERTIFICATE OF APPEALABILITY**

A petitioner seeking a Certificate of Appealability
must demonstrate "a substantial showing of the denial of a
constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner
satisfies this standard by demonstrating that jurists of reason
could disagree with the district court's resolution of his
constitutional claims or that jurists could conclude the issues
presented are adequate to deserve encouragement to proceed
further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). The
Court will not issue a Certificate of Appealability because
Petitioner has not made a substantial showing of the denial of
his constitutional rights. See Slack v. McDaniel, 529 U.S. 473,
484 (2000).


**VI.   CONCLUSION**

For the foregoing reasons, the Court will adopt Judge
Sitarski's Report and Recommendation, overrule Petitioner's
objections thereto, and deny the Petition for a Writ of Habeas
Corpus without an evidentiary hearing. The Court will not issue
a Certificate of Appealability. An appropriate order follows.

57